Council, have you all agreed on a division of time? Yes, we have. We have 20 minutes, and we've decided to divide it 5 each. I have 5, the other council has 5, and then we're splitting rebuttal. 1.5 minutes for me, 1.5 minutes for Ms. Donson, and 2 minutes for Mr. Klein. But you'll probably modify that depending on who needs the time the most, and we'll hear what the other side has to argue. Please keep track of your time so that you don't intrude into co-council's time, because the first 20 minutes is reflected on the clock. Yes, I'm taking off my watch right now, Your Honor, and putting it right in front of me. Thank you, Your Honors. Good morning. My name is Georgia McMillan, and I represent the defendant appellant on appeal. This is a sentencing case as well, and I guess right off the bat, we've got to talk about jurisdiction. The government says that the court doesn't have jurisdiction to review this sentencing error because the error is not reviewable. Appellant says that the court does. Appellant acknowledges the general rule that when a defendant is sentenced within the applicable guideline range, that sentence is not reviewable on appeal. But there is a caveat to that general rule which says that when the appellant is sentenced and that sentence is a violation of the law, that sentence is reviewable. We think that's the case here, Your Honors, that the sentence that was imposed on my client, Iosefo Nofo Sagote, is a violation of the law. It's a violation of the law because we think it represents sentencing entrapment. So, having established jurisdiction, I'll move on to some of the contested facts in the case. First, I think that it's important to understand the context of this case, and there's two key elements of context that I wanted to talk about. One, who was Nofo Sagote? The key fact here is that he was an unemployed young man and a father of two children. Unemployed, father of two children. Counsel, before we go on, I don't think the sentence entrapment issue is as cut and dried as you said. If we disagree with you regarding whether or not the evidence in the case supports a claim of entrapment, do we then lose jurisdiction over this case? I think the answer is yes. Okay, and upon what do you base your argument that sentence entrapment is present in this case? Based on the second of the two purchases. If I might go into the facts a bit, Your Honor. Let me just ask you this. The way this arose was because your client asked for a downward departure based on sentencing entrapment. Is that correct? Yes, that's correct. And we don't have authority to review a district court's denial of downward departure. Would you agree with that? Generally, I agree with that statement, Your Honor. But there is always a caveat to these general rules. What case are you relying upon to say we can review a downward departure if sentencing entrapment is available? Well, Your Honor, there is no case directly on point. However, I think that there is authority for the court to review the issue in this case based on other cases from our circuit which acknowledge the court's discretion. For example, you have the case U.S. v. Cervantes-Valenzuela, U.S. v. Culbertson, U.S. v. Campbell, U.S. v. Coleman. Our discretion to do what? Your discretion to review a downward departure where that downward departure comes from within the applicable range. Did you cite those cases in your brief? I did not, Your Honor. Yeah, because I'm not sure that they stand for that proposition. But go ahead. They don't stand for the proposition that you have discretion as to sentencing entrapment.  But I'm citing those cases to Your Honor to show that our circuit has acknowledged that the sentencing court has discretion in certain instances. The sentencing court, but the court of appeal. And those cases also acknowledge that the court has the sentence is reviewable by the court of appeals. But they did not involve sentencing entrapment, admittedly. So on to sentencing entrapment. I mentioned that my client was an unemployed father of two young children. I also think that another important context that needs to be clarified for the court is that there seems to be a difference of opinion between the government's brief and the appellant's brief as to this marketplace that we were talking about. And I'm going to call this the Talupe drug marketplace. My brief, especially the chart on pages five to eight, sets out the economy, the pricing that Talupe set for his product. And if you'll bear with me, because this is kind of important in looking at this issue of sentencing entrapment. Basically, in the Talupe marketplace, an eight ball of ice sold for $400 to $450. And all of a sudden I see my time is going really quickly. But if you look at the chart in the opening brief, you'll see that that's what an eight ball, one-eighth of an ounce of ice sells for, $400 to $450. Across the board, across the sellers, across the period of time. When the government approached my client on October 24 and 27, they offered him double that amount. I see no place else in the record where they offer other street peddlers double that selling price for that product. And the argument for the sentencing entrapment is that this lured my client into making especially the October 27 deal. It lured him in because it offered him twice the normal going rate. And the record also shows that for these drug peddlers, they received no economic advantage to these deals. The money from the deals went straight to the boss. So in my situation, my client stood to earn a very good profit. He stood to earn what the boss normally earns. And that that was a lure, especially with respect to the second deal. He was manipulated into making that deal. And that's where the sentencing entrapment comes from. Doesn't entrapment include an assumption that the person is not willing to, is not already predisposed to commit the crime? If the client was selling ice already, then wasn't he predisposed? He was selling ice, but he wasn't selling ice in that amount. He was selling ice in so-called paper amounts, which is a quarter of a gram. So he wasn't predisposed, in your view, to selling large amounts, just small amounts? That's our view. He was a small-time dealer. Thank you, Your Honors. Good morning, Your Honor. On behalf of Appellant Louis Domingo, I can't really see the time on the clock, but that's a three. Is that a three? Twelve. A two. Okay. Sorry. The main issue, there are two issues mainly that Domingo is appealing on, but the main issue is that he feels that the district court erred when they sentenced him based on acquitted charge. And this acquitted charge added, actually, a considerable amount of time. He would have been sentenced to 60 months, and he went instead to 240 months. So an amount of time, and he's arguing that this should have been done on a clear and convincing standard. On the record, there was not a mention that it was done on a clear and convincing standard. Didn't the court say beyond a reasonable doubt? No, Your Honor, not on this particular charge. The court did not on the acquitted charge, count 22. He was found acquitted of that charge. What did the court say when it was enhancing the sentence for the acquitted conduct? It didn't make any finding regarding the existence of the conduct? Actually, on the sentencing record, he did not. He just proceeded to start with his sentencing with denying the acceptance of responsibility, and then he chastised the client how awful he thought he was as a drug dealer, et cetera. Is this the case where the court had already given a written? Had the court previously given a written? Not previously. After the fact, Your Honor. The court issued a findings of fact three days after sentencing as to the findings of fact as to why. And in that one, it was just a repeat of what was in the pre-sentence report, and then a sentence was added or went into certain elements that he bases on clear and convincing evidence. However, the evidence was not clear and convincing. Well, now, just a minute. There doesn't seem to be any problem with submitting written findings after the hearing, and this is the district judge's finding, clear and convincing. You don't accept that, but that's the finding. But it's after the fact, Your Honor. It's not during sentencing. Well, because on the sentencing transcript, he says you have a right to. You must know judges often say things orally, and then a day or two or three days later, they put it in writing. Well, I'm not familiar with this. It's not after the fact. I'm not familiar with this in criminal because in the criminal sentence, they are supposed to, the judge is supposed to articulate the basis of the finding and the basis for giving the particular sentence. On the record during sentencing. What I said as a district court judge, I often, my findings, my written findings came days after I pronounced sentence orally. I think that's a common occurrence. Well, I'm rejecting to that, Your Honor, because I haven't found that, and I find that, and the basis for the court's findings as far as clear and convincing has many errors because it wasn't clear and convincing. The government was supposed to prove if you're going to enhance a sentence based on acquitted conduct. They have to prove that with clear and convincing evidence, and it just wasn't there in the record. The government and the court relied on mainly one witness's testimony, and there were vague statements, and the statements were not supported in the record in the testimony as far as Mr. Domingo's culpability and his actions of his awareness that there were 26 pounds of drugs in the warehouse. So the court found during the oral sentencing, there is no doubt in my mind whatsoever that Domingo was aware of the drugs. So what standard do you think that was? If the court said there is no doubt in my mind whatsoever, you don't think that meets the clear and convincing? No, I don't, because what evidence is he basing that on? That's his personal opinion. But, I mean, if you say no doubt, is that equivalent to reasonable doubt, clear and convincing, or preponderance in your view? If we just look at the words, what is he articulating by making that statement in your view? Setting aside whether or not you think there is evidence to support it, what do you think he's saying if he says there is no doubt in my mind? I don't think he's stating that as clear and convincing evidence because I don't think he's raising it to the level. I personally feel, in reading that, that it's his personal opinion about how he feels about what's going on. But you have to articulate what evidence are you basing this on? What evidence is the clear and convincing evidence? And there was no evidence there. The witness that testified that they relied on is Nguyen Mate's testifies, and he only says that he was the one that mainly drove Tolupi to the warehouse, but he even states that he only went there one time with him to carry boxes. He never went inside. He doesn't state, and there was no testimony that stated, that Mr. Domingo went there more than one time as a passenger when Nguyen Mate was driving. There was no testimony that stated how many times he went to the storage place. Did he go inside? None of that was on the record at all. And the evidence that was stated in the presentence report under paragraph number 40, it says that these statements were not referenced by transcript testimony, but per the U.S. attorneys giving the probation department this information, because there is nothing on the record that Mr. Domingo had ever been inside this warehouse, knew it was there. He dealt in the papers as the previous defendant did. He just dealt in these small little papers that he sold for between $15 and $20. He was not a big drug dealer. He was not aware of all that went on with Mr. Tolupe. He was given orders, this is what you sell, it paid for his rent, it paid basically for his rent, his living expenses, and that's it. And he was given them, he was told what to sell them for, and then he turned the money back into Mr. Tolupe, and his rent was paid based on that. But he didn't have any knowledge. There was no evidence that he had any knowledge what was in there. Neumati also stated when he, in his interview, that he stated that Domingo didn't, you know, he didn't even know about the hiding place Tolupe. Is there any of you in criminal cases finding the fact and reasonable inferences from those facts? I think you can find reasonable inferences, but I think that you have to have… Not us, the trier fact. The trier fact. The trier fact can find reasonable inferences, Your Honor, but I think they have to be reasonable, and I don't think that there were any facts that these inferences could be drawn. It was a broad statement. You're arguing, as I understand it, that he never went in the warehouse, that there's nothing to show that he ever went in the warehouse. Had he gone in the warehouse, then maybe he would have seen, but he didn't go in the warehouse, and so that means there's no evidence that he knew what was inside. Well, not only did he not go in the warehouse, Your Honor, but he was not privileged to what necessarily information that Mr. Tolupe was dealing on. He was told to do certain things. He was like a gopher. He was told to, here's the papers you sell, sell them for this price, so he did it. He was told, you wash the drugs, okay, you wash them. He was told what to do. He was a gopher. He was a worker. He didn't have knowledge, and someone like that would not have knowledge of what the top guy had or didn't have. He wasn't privileged to that information. He was just told what to do, and he did it in order to supply his habit. And I'm sorry, Your Honor, but I'm running into, unless you have any other questions, I have to turn over the time to. All right. Thank you, Counsel. Since we've heard so much about Mr. Tolupe, I'm here for Mr. Tolupe. When I started practicing law, I remember after I did a trial, this elderly trial judge brought me to his chambers, and he said to me, I just want to give you one bit of advice. The bit of advice is that when you cross-examine a witness, make sure you end strong. That's something, as trial attorneys, we've all been addressed. And the reason I raise that at this point is because the government has conceded, obviously, that the questions that they have asked of my client during his testimony were improper. And what I'm referring to, of course, that litany of questions of you heard the FBI agent talk, and now you're saying he is guilty, you know, that whole litany that we've heard, and that this Ninth Circuit has said clearly that those types of questions are inappropriate, and the government has acknowledged that at this point. When we take that and we look at that standard and we look at the evidence that was said in this case, and the fact that we're now dealing with an individual who's testifying, that type of questioning is just to say he's gotten a fair trial. As Judge Noonan had said previously, logic is not always there in these cases. But I have a client, Your Honor. The man was acquitted of all of these serious conducts. I mean, he was convicted of these small drug deals. And he gets acquitted of the 24 pounds of ice, of guns. He gets acquitted of it. And one week after we did... That is correct, Your Honor. He's found not guilty of that. And what we're now dealing with then is one week after that trial, without any input from either defense counsel or from the government, the trial judge makes these findings that basically says that I find, and I would like to correct the court in those findings. I'm the one who had the findings a week before it, Your Honor. I'm the one who had the findings a week after trial. And it was in those findings that the judge said he doesn't find it beyond reasonable doubt. He said he finds beyond all doubt. And the problem that I have with these findings, Your Honor, is that these findings are done. I mean, when we come to court, sometimes we have a feeling how the judges are going to rule. In this specific case, what happened is that the judge told us ahead of time, before there was any input from anyone whatsoever, before there could be any argument, before there could be any discussion like we're doing over here, the judge already decided at that point what they were going to do at that time and declare at that point. Maybe, but maybe not. Do you know how a third of the court would read what happened here? The court's saying is if the jury found him not guilty, if he'd been trying it to me, he'd be in deep trouble because I would have found him guilty. I think it was proved beyond reasonable doubt. Now, he can't go back and say the jury says not guilty, we're going to change it. We're going to set aside the jury finding. He didn't do that. But when he got ready to sentence, what he had to do was the range of the sentence for what your client was convicted of and nothing more. He could only sentence him for what the jury found him guilty of. Now, when he got ready to do it, there's a range. And he had to decide, am I going to put him at the top or the bottom? And he decided I'm going to put him at the top because I am satisfied beyond reasonable doubt that he did these things and I'm for just what he did, nothing more. I'm going to decide based on what I believe the evidence showed I'm going to put him at the top. Now, when we look at it that way, and I'm not suggesting that's the way you ought to look at it. You tell us if that's not the way you ought to look at it. But if he looks at it that way, how does it make a whole lot of difference, what do you think? This is where the problem is. In this case, he wasn't telling, he wasn't saying, I feel the guy was guilty, even though the jury said he was not guilty. What he was doing is he was instructing the probation department to write their report in a certain fashion that those decisions, that the guidelines that would come out, weren't going to be based upon what he was actually convicted of. But instead, he was instructing the probation department to make sure that those findings were higher than that. But Counselor, he could have done that without instructing the probation office to do it. Your Honor, I agree with that. And there's one other issue I'd like to address because I have like 40 seconds if I can, Your Honor. As long as you're helping us, we don't shoot you down. Okay. Well, in that case, Your Honor. No, no, no. Don't do that. License to keep going. No, I understand that. As far as the issue, as far as what the trial judge can do, we have a procedure that is set forth that we follow as attorneys whenever we have our clients being sentenced. We have this procedure that is set forth where what happens is that our clients get interviewed by probation. Probation looks at these things. There's a pre-sentence report, a draft pre-sentence report that is prepared. That we then have an opportunity to make, you know, objections. And that the trial judge rules on those types of objections. We have done away with that in that circumstance here. Counsel, that doesn't preclude you from still making your point. I mean, oftentimes judges are swayed by powerful and persuasive advocacy on the part of a defense counsel. I mean, he just put in writing what he was thinking. Judges don't go into a sentencing hearing as blank slates. Judges will normally have a predisposition regarding how they're going to rule. They wouldn't be prepared otherwise. So basically, he just put in writing what he was thinking, which all judges do. When they go in, they have some idea of what the case is about and what their inclinations are. Otherwise, you could just punch buttons into a computer and come out with a solution. So you can't fault a judge for being prepared and for having thought about the issues and at least come to a preliminary idea of how he was going to rule. You know, Your Honor, if it was only a preliminary ruling, I would be fine with that. But it wasn't a preliminary ruling. It wasn't as though he was asking for input at this point. What he was doing at that point was he was saying, this is what I find, and this is why Mr. Tolupe is going to get life in prison. Unfortunately, he made one other mistake in that they didn't give to the jury whether or not it was more than 50 grams of ice, right? Because of that, he couldn't sentence him when it came down to it. Even though his guideline range was life, he couldn't sentence him to life at that point. That's neither here or there. But what we're talking about is that it wasn't a circumstance in which it was a preliminary ruling, which we have a judge here who sometimes put her inclinations on the web so we could look at it and go ahead of time. This is very unusual. And when we're dealing with someone looking at life in prison, to tell the person the day after you go into trial that, hey, this judge has already decided to give you life, I think is something that we should look at very carefully. So what would you have us do? Would you say that because of this, what? Well, on this, I would ask for a retrial based upon some other reason. But based upon this particular thing, I would ask the case to be remanded and to be resentenced by a different judge. Because I don't think that this judge could quite fairly make the ñ I mean, we all know what the findings are going to be on this. Whatever the findings are going to be, I mean, let's not be, you know, we're not ñ I'm not asking the court to send back the record, to have Judge Jones correct it in that regard. The problem is that our case authority gives judges, the sentencing judges, the right to consider acquitted conduct in determining the sentence. And I understand that. That's one of the logics that we all deal with in this system. However, the question is, is that we still have to deal with what evidence there was regarding it. Whether or not that evidence does it. And then we have to discuss the standard of proof that has to be done. And the question is, is I know that it was argued before that it was ñ the proper standard is clear and convincing. For the record, we're arguing it should be proved beyond reasonable doubt. I know it's contrary to the U.S. Supreme Court, but it is something that obviously can't be preserved for the record. But besides that, there's one other issue that I would just like to address very briefly, and that has to do with the wiretap affidavit. Everyone, you know, looks at these wiretap affidavits, and we look at them. They're 60, 70 pages long. And the Ninth Circuit, one of the things that the legislature has said is that they have to show that these are needed, that these are necessary, these wiretaps. I mean, it is in a circumstance where just because they want a wiretap, they should get it. And when we look at this particular case and what the government has done, they cited two other cases that came ñ You know, I know your time is up, and I think we're going to deal with that issue. You've raised it in your brief. And the question that we have to look at is, did she lay a sufficient foundation for the wiretap? Isn't that what we have to decide? I think that's what you have to decide. But the question is whether or not what they were saying, and what the government has said is that they said, we've got to know where the stash houses are, we've got to know where money is, or whatever. You could say that in any drug case. And in this particular drug case, unlike the cases that have been cited by the government, in which we're dealing with these very vast conspiracies involving the Mexican mafia, with hundreds of alleged conspirators there, what we were dealing with in this particular case were individuals who had already been on the wires, talked, you know, consensual calls. There were people who were testifying against them. They were under surveillance at that point. And I'm not here to second that. You know, it's the armchair quarterback, right? And you do that. But what we're talking about here is we're talking about the Congress who has said they have to show it's necessary. It's not just something that I'm making up here. I mean, this is what they said. And the reason we say that is because we don't want wiretaps. As a society, as Congress has established, we just don't want wiretaps all over. And they have to make that showing. And in this particular case where what you had is, according to their affidavit, they had Toa Lupe already on the phone discussing a drug deal. They had hand-to-hand seals. They had confidential informants. They had cooperating defendants at that point. Where's the necessity at that time? Thank you. I'll give each of you one minute for rebuttal, but let's hear from the government. Good morning. May it please the Court. Assistant United States Attorney Tom Brady on behalf of the United States. Unless there's questions right off the bat, what I want to do is just give a brief overview of what the case was involved because I'm the only one in the courtroom that was actually there. The trial commenced the first week of June 2002, and this was before Robert Jones. Judge Robert Jones was a visiting judge from Oregon. The case took two weeks. Of the seven defendants that were indicted, six went to trial. I think this case, and before any other judge, would have been at least four weeks long. Judge Jones kept a very tight ship and had a very demanding style to him and held the government to its burdens proof in all of the charges. The evidence presented at trial were basically hundreds of recorded conversations involving the three defendants that are present in argument today, a testimony of hand-to-hand drug sales with these three individuals, body wires, recordings of Mr. Tolupi and Mr. Domingo discussing procuring and washing and distributing multiple pounds of drugs. There were drugs found on Mr. Tolupi when he was arrested. There were drugs found in the apartment of Mr. Domingo when he was arrested. It wasn't his apartment, but it was the one that he was staying in at the time. There was the redacted confession of Mr. Tolupi. The court obviously heard the full confession at sentencing of Mr. Tolupi. There was the redacted confession of Mr. Domingo at trial, and again the court heard the full confession of Mr. Domingo as well. In Mr. Tolupi's confession, he admitted to the drugs, the guns and to the money, and in Mr. Domingo's confession, he admitted to being selling drugs for Mr. Tolupi for the last two years, that he would get drugs from Mr. Tolupi for every week and that he was selling them on a regular basis and that he was a trusted person for Mr. Tolupi down at the corner where he was selling his drugs. We also had the testimony of a co-defendant, Parosi Niyamata, who said that all three of these individuals were involved in the drug organization and that they were extensively dealing and distributing methamphetamine, and we also found methamphetamine, approximately 26 pounds of methamphetamine, over 34 weapons, and $50 in cash. With that said, prior to trial, four to five weeks prior to trial, there was a pretrial hearing in which the court had the government present all of the evidence that it was going to present at trial, and there was an extensive hearing as to what was coming in and what wasn't coming in. All the pretrial recordings, the telephone conversations, the audio body wires were all laid out to counsel. They all were able to give objections as to which ones they wanted in and which ones they didn't want in, and that was all done four to five weeks prior to trial. So when we went to trial, we knew what was coming into trial and what wasn't. As to the necessity of the wiretap, in the summer of 2001, Chief Judge David Ezra for the District of Hawaii had reviewed and authorized the wiretap. Counsel, could you get to the necessity? I think the necessity argument is the crux of the challenge, the wiretap. So opposing counsel's argument is that you already had cooperating defendants, you had confidential informants, you already had conversations that had been tapped, so why did you need additional wiretaps? What was being shown a necessity? Well, as you've mentioned that, I recall something that counsel had said. We did not have a conversation with Mr. Tolupi at that time. Yes, we had several buys into low-level distributors for eight balls or smaller amounts of drugs, but by no means did we know the extent of this drug organization. We were able to get cooperating defendants in or cooperating sources in to buy small levels of drugs in the neighborhood of one-eighth to two-eighths of an ounce of methamphetamine. But that was it. That was the extent of it. And as the Court articulated in its findings, it found that the first cooperating source was insufficient because the drug organization became suspicious of him. In fact, they sold him bunk at one point. They no longer trusted this cooperating source, and we could not use him after that. Cooperating source number two never did any drug deals with any of the drug members of this organization. Cooperating sources three and four, they had information, but it was not up to date as to the stash houses, pickup and deliveries, that sort of thing. We knew that this organization was dealing drugs on the corner of a particular apartment in Waipahu here in Hawaii, but we didn't know how they were getting the drugs, where they were storing it. We knew that the drugs were not being kept on site. And with cooperating sources three and four, we didn't have that information. We had several cooperating defendants. These were nephews of Toa Lupi who were arrested in a separate drug organization, but they had information about Mr. Toa Lupi. But they only provided a certain amount of information. In fact, they weren't giving us the whole story about what Mr. Toa Lupi was about, and obviously we could not use them at that point as Mr. Toa Lupi was suspicious of them, and we could not use them into finding out more information about Mr. Toa Lupi's drug organization. We had some physical surveillance, but that was limited in what we could actually see, and obviously we couldn't tell what the conversations were. Obviously we had some pen registers, but again, that only told us the associations and the frequency of contacts. It did not tell us what the context was. And we discussed in the affiant, discussed the grand jury methods, and those would have likely failed given the nature of this drug organization and that the individuals we would be putting in the grand jury were actually co-defendants in this case. So that wouldn't have worked either. But the court articulated all the reasons why this was a necessary step, and yes, we did have some limited success at the time with cooperating defendants or cooperating sources buying small levels of drugs, but no way would we have been able to find the stash house or where Mr. Toa Lupi actually was storing the drugs in this case. So we feel that, again, the two district court judges that reviewed this showed or agreed that this wiretap was necessary. And, counsel, could you also address opposing counsel's argument that the district court had already, in fact, directed the probation department as to what to put in the pre-sentence report and had already made up its mind regarding the sentence? This case, obviously, was not a change of plea case. This was a full-on trial in which Judge Robert Jones heard all of the evidence. And, yes, I think he wrote his findings the day after the conviction, and they were filed subsequently. I agree that that probably had an impact on the U.S. probation, on how they were going to come out with their pre-sentence report. However, I agree with the court that the judge heard all of the evidence in this case. He heard about how Mr. Toa Lupi was organizing and controlling this entire distribution of methamphetamine in Waipahu. And I think the court did give notice, this is what my intentions are. I'm thinking I'm going to find leadership and I'm thinking I'm going to find obstruction. You sat before me and you said you didn't sell any drugs at all. And you sat before me and said, that's not me on the wire. And I heard the wire and I heard the witnesses. So I think it was more than proper for the court to come out and say, look, this is something you're going to need to address at sentencing. I am finding both obstruction of justice and a leadership role. And I don't think in any way the counsel or Mr. Toa Lupi was not given an opportunity at sentencing to object to the pre-sentence report or to offer any evidence in support of why those enhancements should not be given. And it was only after, at sentencing, that the court determined what the guideline range was. I don't think in any way this prejudiced Mr. Toa Lupi. I think, if anything, it gave him a heads up.  Could we move to the next defendant, the issue regarding Mr. Domingo? Yes, Your Honor. The standard of proof that was used to enhance based on the acquitted conduct. Your Honor, I think counsel is right that at the time of sentencing, the court read off a litany of things that it was finding by the preponderance of evidence. It concurred with probation that finding that Mr. Domingo, it was reasonably foreseeable for him to know about the 26 pounds of methamphetamine that was in the storage room. But I also note that the court wrote immediately thereafter, I find this beyond clear and convincing evidence that Mr. Domingo is responsible for the 26 pounds of methamphetamine that was attributable to him. And I want to also note to the court that, yes, he was acquitted of count 22, Mr. Domingo. And therefore, in one way, this is an analysis of what standard to use in acquitted conduct. But he was also convicted of count two, which this was an overt act in count two, that the 26 pounds of methamphetamine was part of that conspiracy, which he was convicted of. And we would submit that that is relevant conduct. And that was something that Mr. Domingo never addressed. And I think it leads us to that second part of Mr. Domingo's argument is that he should have been given acceptance of responsibility, and we would submit that he should not. And the reason for that is at trial, Mr. Domingo basically wanted to distance himself from Mr. Tolupe. What he said basically is, look, I'm a notorious drug dealer. I deal with a lot of different drug organizations, no one in particular, and I'm not part of Mr. Tolupe's drug organization. So he tried to distance himself from Mr. Tolupe, despite the fact that earlier when arrested, he said, look, I've been selling Mr. Tolupe's drugs for the past two years. At sentencing, he admitted only to the substantive counts in which he had a hand-to-hand drug deal with a cooperating source. He never mentioned Mr. Tolupe's name. He never mentioned being part of that organization. And I think that was something that the court tried to give him an opportunity to do. Do you have anything else you want to tell us? I got your letter. Anything else you want to tell us? And he said no. Mr. Domingo denied the opportunity to clarify what his role was in the conspiracy, which he was convicted of. And I would just note to the court that Mr. Sugoti was found not guilty of the conspiracy charge, and yet the court didn't punish him for not admitting to acquitted conduct, as kind of been alleged in the Domingo brief. In fact, Mr. Domingo failed to recognize, failed to take acceptance of responsibility for the convicted conduct, that being the conspiracy charge. In your view, counsel, do we have jurisdiction over Mr. Sugoti's claim? Judge, our initial position is no, that it's not reviewable, but I want to alert the court to a decision. It's not in my brief. It's RIEVE, R-I-E-V, E-W-E, 165, Fed 3rd, 727, 9th Circuit, 1998 case, in which there's really two possibilities or remedies for a sentencing entrapment claim, and only one of them is the court can grant a downward departure. The court can also decline to apply the statutory penalty provision of the greater offense that the defendant was induced to commit, and in this case that was not discussed at all. I think this court... How do we get there? If we were inclined to say that there was sentencing entrapment, how would we get there procedurally? Well, I think the court can review the sentence that was imposed, and beside the issue of downward departure and whether or not that's reviewable, the court can instruct the district court that, look, you have another alternative that you didn't discuss, and that is you could have completely ignored the higher mandatory minimum in this case and sentenced under a lower. I don't think that would have been applicable in this case because of this reason. The court went to the 20-year term. But all we have before us now is the denial of the downward departure request. That is correct. And so in light of our precedent, do you think we have jurisdiction to review that? Judge, I think you could find a way to review that. Under the case you just cited? Yes, yes. Is there any other questions? It appears not. Thank you, counsel. We'll give each of you one minute for rebuttal. Could you please put it on one minute? Thank you, Judge. Judge Rawlinson, you just asked my adversary, how would the court procedurally get to review the issue of entrapment? Appellant submits that you could by going to subsection 1 of 18 U.S.C. 3742, which says that the court can review sentences that are imposed as a violation of the law. All right. Thank you, Judge. It's hard to cover everything that I'd like to cover in one minute, but I would like just to point out to the court that in my reply brief, I do go over each one of the points in the findings of fact as a rebuttal, and so to review that information so I don't have to go over it. As far as the acceptance of responsibility, under the sentencing guidelines, it states that a defendant clearly demonstrates acceptance of responsibility for his offense and it can decrease by the two levels. It states that the defendant is not required to volunteer or affirmatively admit relevant conduct beyond the offense of conviction in order to obtain a reduction under subsection A. He may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain that reduction. So in his letter, excuse me, in Mr. Domingo's letter to the court when he did accept his responsibility, he was not under any obligation to admit any responsibility for the acquitted conduct, which was the count 22. He admitted responsibility for what he did, that he did deal in drugs, that he did sell, and he was very sorry for what he did. He was an addict and he was supporting his habits. So I think that he was entitled and he should have been entitled to the acceptance of responsibility because he's not required to admit something that he did not do and he was found that he was acquitted of. Thank you, Your Honor. Thank you. Going on to the wiretap, the government said that Mr. Tolupe was not involved and that's why they needed to get this wiretap. According to the affidavit that was submitted, and I'm calling the Court's attention to the excerpts of the records of pages 33 and 34 on November 8, 2001, and this is their application for the warrant, confidential source, page Mr. Tolupe, a patron number, blah, blah, blah, and Tolupe returns the page and we negotiate with them and purchase a one-ounce deal. So I'm not sure why they're making those representations to the Court. The second point has to do with what they're claiming is the strength of the evidence against Mr. Tolupe. One of the things that they focus on is Mr. Tolupe's confession, so to speak. This case, when I was given this case, Your Honor, I was given boxes of videotapes, audiotapes, so forth and so on. When Mr. Tolupe was questioned, supposedly, by the FBI, they turned it off. And we all heard this, we all heard it a dozen times, it's FBI policy, okay? Well, you tell me how much weight we should place on an investigation with dollars investigating it and they won't spend 50 cents to record my client's alleged confession. The confession that he denied, which brings to me, back to my initial point, the problem with that whole litany of questions going, and the FBI lied about this, and you're saying the FBI lied, the police lied, blah, blah, blah. And so it's not very clear. Thank you. Thank you. The case that's argued is submitted. That completes our calendar for the day, and we are on recess. All rise. Thank you, Your Honor. Thank you. Thank you. Thank you. Thank you.  Thank you.  Thank you.        Thank you. Thank you.    Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: Silverman, W. Fletcher, Rawlinson